## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **Criminal No. 23-CR-322 (TJK)** |
| | : | |
| CLARENCE MINOR, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S
### MOTION TO SUPPRESS EVIDENCE

The United States of America, by and through the United States Attorney for the District of Columbia and undersigned counsel, respectfully submits this response to Defendant's "Motion to Suppress Evidence" (Docket Entry 17) (hereinafter "Def. Motion"). For the reasons stated below, the United States respectfully submits that Defendant's Motion should be denied.

### PROCEDURAL HISTORY

Defendant was charged by criminal complaint on July 19, 2023, with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of an Offense Punishable by More Than One Year in Prison, in violation of 18 U.S.C. § 922(g)(1). (Docket Entry 1). On July 25, 2023, Defendant was ordered held without bond pending trial. Minute Entry, 7/25/23. On August 18, 2023, the parties jointly moved to continue the scheduled preliminary hearing to discuss a possible resolution of the case. (Docket Entry 9). On August 21, 2023, the parties jointly moved for a Protective Order to govern pretrial discovery, which order was granted on August 2, 2023. (Docket Entries 10, 12).

On September 8, 2023, the parties moved again to continue the preliminary hearing to continue discussing a possible, pre-trial resolution. (Docket Entry 13). On September 19, 2023, a

1

federal grand jury sitting in the District of Columbia returned a one-count Indictment, charging Defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of an Offense Punishable by More Than One Year in Prison, in violation of 18 U.S.C. § 922(g)(1). (Docket Entry 15).  On October 3, 2023, Defendant advised the Court that he was still considering whether to accept the plea offer or proceed to motions practice and trial.  In response, the Court set a motions calendar date on the understanding that the dates could be converted to a change of plea if the parties desired. <u>Minute Entry</u>, 10/3/23.  On November 1, 2023, Defendant filed the instant motion to suppress consistent with the Court's scheduling order.  (Docket Entry 17).  This opposition follows.

## **<u>FACTUAL BACKGROUND</u>**

The stop in this case began when, at approximately 7:14pm on July 17, 2023, a 911 call was placed regarding a "man with a gun." A rough transcript of that call follows.

DISPATCHER:     D.C. 911, what's the address of the emergency?

CALLER:         I'm at the back of my house [number redacted] North Capitol Street right now, I'm watching three youths walk down Rock Creek Church Road towards North Capitol. One just pulled a gun out of his backpack.  I don't know what for.

DISPATCHER:     Okay, one second, repeat the address.

CALLER:         [redacted] and they were walking South on Rock Creek Church Road towards North Capitol. And the…

DISPATCHER:     Where are they walking from, do you know?

CALLER:         I just… they were at Price Grocery.

DISPATCHER:     Okay, one second.  You said how many?

CALLER:         There are three.  And the youth that I'm looking at right now is

|  | wearing a white tank top, black durag, no more than 16, 17 years old. |
|---|---|
| DISPATCHER: | And they were walking from Price Grocery and had a gun out? |
| CALLER: | Down to North Capitol Street walking South on Rock Creek Church Road. In the 500, 5000 block of Rock Creek Church Road. |
| DISPATCHER: | So they're walking towards Rock Creek Church Road right now? |
| CALLER: | No, they're walking towards North Capitol Street. |
| DISPATCHER: | North Capitol, okay. |
| CALLER: | Yeah, they, you better get going because they are I don't know where they're going to go, but… |
| DISPATCHER: | How many people have a gun? |
| CALLER: | One person has a gun. |
| DISPATCHER: | Okay, does he actually have it out walking, or he just pulled it out? |
| CALLER: | He, he went behind a car that was in my line of sight and he pulled it out of his backpack, and he put it in his waistband. |
| DISPATCHER: | Okay, and what was his description? |
| CALLER: | Black Male, 5'8", 5'9", white tank top, jeans, black durag, loose fitting black durag.  Now, there's, yeah. |
| DISPATCHER: | And how old did he look? |
| CALLER: | He looked 17 years old. |
| DISPATCHER: | So, 17 year old male white t-shirt, jeans, |
| CALLER: | White tank-top |
| DISPATCHER: | Ok, White tank-top |
| CALLER: | Yep, black loose-fitting durag. |
| DISPATCHER: | And you said a black durag. |

3

CALLER:            Yep, loose fitting, not tight. Loose.

DISPATCHER:        Any mask?

CALLER:            Pardon?

DISPATCHER:        Did he have a mask on or anything?

CALLER:            A backpack. Yeah.

DISPATCHER:        A backpack, what color?

CALLER:            It was a black backpack. I can't see them anymore. I'm standing out on Rock Creek Church Road right now, but I can't see them anymore. They may have gone into the projects. Uh, but it wouldn't be a bad idea sending a unit down. I don't know. But I just had to call.

DISPATCHER:        Okay, he put in in his waist, on what side, did you see?

CALLER:            Yes, on his right side.

DISPATCHER:        And he was with how many other people, two?

CALLER:            Two youths. Yep.

DISPATCHER:        Okay.

CALLER:            One of the other youths was probably over six foot, African American, white tank top, jeans as well, really, really wild, wild hair. And that's the only other one…

DISPATCHER:        And he had on jeans, too?

CALLER:            Yes, ma'am.

DISPATCHER:        Okay. And you said wild hair, like a bush?

CALLER:            Yea, it was like, it was a 'fro, but like wild. Like he hadn't combed it in days.

DISPATCHER:        Okay.

4

CALLER:                Yeah.

DISPATCHER:       And the other one, you said you couldn't get a description?

CALLER:                I couldn't, no ma'am.

DISPATCHER:       Do you know if they were black, white, Hispanic, or Asian?

CALLER:                They were black, they were all black.

DISPATCHER:       And they are on foot, correct?

CALLER:                Pardon?

DISPATCHER:       They are on foot.

CALLER:                They are on foot, yes ma'am.

DISPATCHER:       Alright, I already sent a call over to Dispatch.  They'll send a unit out.

The 911 operator then acquired the caller's identifying information and phone number.  Based on the information provided by the 911 caller, the MPD dispatcher knew the suspect's race, approximate age, the clothing he was wearing, and the direction he was traveling – southbound on Rock Creek Church Road toward North Capitol Street – before he lost sight of them.



As a result of that call, the Metropolitan Police Department's ("MPD's") Fourth District ("4D") dispatcher voiced a "lookout" as follows: "Be advised, lookout for black male with a black durag, approximately 17 years old, wearing a white t-shirt, jeans, and a black backpack." The dispatcher noted that the caller advised that "the subject pulled a gun out of the backpack it's going to be on his waist on the right side." The dispatcher then repeated "5-2, you copy that lookout? Again black male with a black durag, approximately 17 years old, with a white t-shirt, jeans, with a black backpack, gun's supposed to be on his right side of the waist." Numerous MPD Officers responded and began canvassing the area in marked police cruisers.

While some officers canvassed the surrounding area, others went to Price Grocery to retrace the individuals' steps and one officer spoke with the 911 caller to verify the lookout. At approximately 7:21 p.m., approximately seven minutes after the 911 call was made, Sergeant Orgel radioed that he had observed a subject matching the description "in the 100 block of Farragut Street, Northwest." The dispatcher replied "units, copy." Sergeant Orgel requested the lookout again, and the dispatcher responded "first, black male, 17 years of age with a black, loose durag, a white t-shirt, jeans, and a black backpack. Second male, six feet tall, white t-shirt, jeans, and there was a third black male, no description for the third black male."

Sergeant Orgel continued to follow the suspect and, at 7:22 p.m., radioed "okay, now he's walking north on First Street." The dispatcher again advised units to respond to that location. At 7:23 p.m. Sergeant Orgel radioed "Yeah, he's just walking north on First Street. He approached a group of people, picked up a child, and separated from the group. Started walking north on First, but he matched the lookout." Based on Sergeant Orgel's radio transmissions, Officers Alsoloman, Fernandez, and Villatoro drove their cruisers toward that location. At 7:24 p.m. Sergeant Orgel

6

radioed "approaching First and Gallatin." The dispatcher responded "copy, First and Gallatin, Northeast Side, correct?" Sergeant Orgel corrected her, stating "Northwest." This location is indicated on the map below in blue, and includes the 911 caller's information.



Sergeant Orgel then requested the full description again, and the dispatcher responded, "The subject with the gun is a black male 17 years of age black, loose durag, with a white t-shirt, jeans and a black backpack." Sergeant Orgel stated that "there's definitely, well, I don't know, let me, let me get a better look at him." The dispatcher responded, "second subject is a black male, six feet tall, wild bush, white t-shirt, jeans." At 7:25 p.m. Officer Fernandez asked over the radio "is that the one with the child?" After hearing no response, Officer Alsoloman asked over the radio "is that the one with the child?" Sergeant Orgel responded, "He didn't have that child initially, he basically borrowed the child from a group of people over by Farragut and started walking North on First." Officer Alsoloman responded, "Copy, I'll make a stop then." The dispatcher responded, "Copy, what's the 20 for the stop?" Officer Fernandez responded, "currently on the Unit block of Gallatin." Officer Alsoloman was first on scene, and contacted Defendant at 14 Gallatin Street, Northwest, as indicated on the map below with the black "x."

7



As captured on Officer Alsoloman's BWC, Officer Alsoloman approached Defendant at 7:26:29pm, and Defendant – a black male – was wearing a loose, black durag, jeans, a white t-shirt, and a black backpack.  Officer Alsoloman exited his cruiser, walked in Defendant's direction, and said "What's going on, man, we need to speak to you, can you put the child down?"



8

Defendant responded "nah" and attempted to push past Officer Alsoloman while blading the right side of his body away from Officer Alsoloman.  When Defendant attempted to push past him, Officer Alsoloman grabbed Defendant's wrist to detain him for a <u>Terry</u> stop and said, "put the child down, man."[1]



As Defendant continued to resist, Officer Villatoro carefully took the child into her arms so that the child would not be in danger and Officer Fernandez stepped into assist Officer Alsoloman. Officer Villatoro continued to hold the child and stayed several steps away from the altercation.

---

[1] The United States concedes that, as soon as Officer Alsoloman grabbed Defendant's wrist, the citizen encounter evolved into a <u>Terry</u> stop that must be justified by reasonable articulable suspicion. At that time, Officer Alsoloman's decision to effect a <u>Terry</u> stop and frisk was justified by the fact that Defendant fit the description provided in the 911 call as well as Defendant's actions during the brief interaction with Officer Alsoloman.



Given Defendant's resistance, Officer Alsoloman was attempting to handcuff him in order to safely execute a <u>Terry</u> frisk. However, due to Defendant's continued resistance he was only able to handcuff Defendant's left wrist. When the child was removed from Defendant's arms, Officer Alsoloman observed a bulge on the right side of Defendant's waistband. Officer Alsoloman then patted that location, felt what he recognized to be a firearm, and removed it from Defendant's waistband. Officers Alsoloman and Fernandez then completed the act of handcuffing Defendant.



10



The firearm was later determined to be a Glock, Model 19, 9mm semi-automatic handgun loaded with one round of 9mm ammunition in the chamber and 10 rounds of ammunition within a 31-round high-capacity extended magazine.  A criminal history check confirmed that Defendant was a convicted felon, having been most-recently convicted of Unlawful Possession of a Firearm by a Convicted Felon in D.C. Superior Court Case Number 2022 CF2 1577 – a case for which Defendant was on supervised release. Defendant was placed under arrest.

A subsequent search of Defendant's backpack revealed 4.5 ounces– slightly more than ¼ pound – of green leafy substance that field-tested positive for marijuana.



**ARGUMENT**

I.    **THE <u>TERRY</u> STOP WAS SUPPORTED BY REASONABLE, ARTICULABLE SUSPICION THAT DEFENDANT WAS CARRYING A HANDGUN**

   A.    **Applicable Legal Standard**

   The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend IV. The Fourth Amendment requires that "all seizures, even ones involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification." <u>United States v. Gross</u>, 748 F.3d 784, 786 (D.C. Cir. 2015) (quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 878 (1975)).

   The Supreme Court has declared that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen."  <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n. 16 (1968). A seizure of a person only occurs when 1) the person is restrained by police of use of willful physical force intended to effectuate restraint, or 2) the person actually submits to a display or show of police authority sufficient to cause a reasonable person to believe that he was not free to terminate the encounter with police. <u>See</u> <u>California v. Hodari D.</u>, 499 U.S. 621 626, 628-28 (1991) (seizure under the Fourth Amendment occurs either upon "a laying on of hands or application of physical force to restrain movement" or actual submission to a show of authority); <u>Brower v. Inyo</u>, 489 U.S. 593 596-97 (1989) (a violation of the Fourth Amendment occurs when there is an "intentional acquisition of physical control," and a "Fourth Amendment seizure . . . [occurs] only when there is a governmental termination of freedom of movement through means intentionally applied").

Notably, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting Hodari D., 499 U.S. at 628). The Bostick Court continued, "We have held repeatedly that mere police questioning does not constitute a seizure," and that "'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Id. (quoting Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality op.); and citing Hodari D., 499 U.S. at 628).

If a police officer develops reasonable articulable suspicion that an individual is engaged in criminal activity, the officers may briefly detain the individual and investigate that criminal activity – including by "patting down" or "frisking" that individual for weapons or other contraband. See, generally, Terry, 392 U.S. at 19-24. An officer may frisk or pat down an individual when the officer has a "reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049-50 (1983) (internal quotation marks omitted) (quoting Terry, 392 U.S. at 21). "The reasonableness of a frisk . . . depends on 'whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" United States v. Washington, 559 F. 3d 573, 576 (D.C. Cir. 2009) (quoting Long, 463 U.S. at 1050) (bracketed language in original).

This limited stop and search for weapons, commonly referred to as a "<u>Terry</u> stop," "require[s] only that officers have a 'minimal level of objective justification.'" <u>United States v. Goddard</u>, 491 F.3d 457, 460 (D.C. Cir 2007) (quoting <u>INS v. Delgado</u>, 466 U.S. 210, 217 (1984)) (emphasis added). The Supreme Court has repeatedly articulated that "[t]the touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108-09 (1977) (quoting <u>Terry</u>, 392 U.S. at 19). In this context, reasonableness "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" <u>Id</u>. at 109 (quoting <u>Brignoni-Ponce</u>, 422 U.S. at 878). As articulated by the D.C. Circuit, "a police officer [who] has a reasonable articulable suspicion 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others' . . . may conduct a limited protective search 'to determine whether the person is in fact carrying a weapon.'" <u>United States v. Askew</u>, 529 F.3d 1119, 1126 (D.C. Cir. 2008) (<u>en banc</u>) (quoting <u>Terry</u>, 392 U.S. at 24).

The D.C. Circuit has repeatedly held that reasonable suspicion for a <u>Terry</u> stop can arise from a "lookout" for a suspect based on a 911 call.  <u>United States v. Abdus-Price</u>, 518 F.3d 926, 929-31 (D.C. Cir. 2008) (upholding validity of <u>Terry</u> stop based on the description of a vehicle); <u>United States v. Davis</u>, 235 F.3d 584, 586-88 (D.C. Cir 2000) (holding that, despite "minor inconsistencies involving mutable characteristics," the defendant matched the lookouts sufficiently to supply reasonable suspicion); <u>United States v. Smart</u>, 98 F.3d 1378, 1384 (D.C. Cir. 1996) (upholding <u>Terry</u> stop based on description of sex, race, clothing, and location); <u>see also</u> <u>Moore v. Volpe</u>, 177 F. Supp. 3d 409, 413-15 (D.D.C. 2016) (Chutkan, J.) (granting motion for summary

judgment in a suit under 18 U.S.C. § 1983 because the <u>Terry</u> stop of jogger who was stopped in front of his house was reasonable based on the lookout description).

Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause." <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'" <u>Id.</u> (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 2382(1983)). "[T]the reasonable suspicion standard 'does not deal with hard certainties,' but rather with 'common sense conclusions about human behavior.'" <u>United States v. Murray</u>, 548 F. Supp. 3d 741, 747 (N.D. Ill. 2021) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981)). The D.C. Circuit holds that, when determining whether a <u>Terry</u> stop is supported by reasonable suspicion, the "Court does not separately scrutinize each factor relied upon by the officer conducting the search." <u>United States v. Edmonds</u>, 240 F.3d 55, 61 (D.C. Cir. 2001) (citing <u>United States v. Sokolow</u>, 490 U.S. 1, 8–9 (1989). Individualized and separate scrutiny is inappropriate for the simple reason that "<u>[a]n officer on the beat does not encounter discrete, hermetically sealed facts</u>." <u>Id.</u> (emphasis added).

As such, "the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them." <u>Id.</u> at 59-60 (citing <u>United States v. Clark</u>, 24 F.3d 299, 301-03 (D.C. Cir. 1994) ("The evidence giving rise to suspicion must not be dissected and viewed singly, but taken as a whole; and it must be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training'") (internal quotation and citation omitted)). "An officer's training and experiences enable him to 'draw[ ] inferences and make[ ] deductions' from seemingly innocuous

facts—'inferences and deductions that might well elude an untrained person.'" Id. at 60 (quoting Cortez, 449 U.S. at 418). Applying this analysis, the D.C. Circuit clearly holds that "even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors—especially when viewed through the eyes of an experienced officer—may." Id.

> **1. The 911 Call Was Reliable and Provided Reasonable Articulable Suspicion to Justify a _Terry_ Stop**

Defendant first argues that the evidence must be suppressed because the 911 call and ensuing "lookout" lacked sufficient indicia of reliability to justify a Terry stop. Def. Motion, at 7-10. This argument is without merit.

Defendant rests his argument on the alleged similarity between the facts of this case to those presented in the Supreme Court's decision in Florida v. J.L., 529 U.S. 266 (2000). Def. Motion, at 8. In J.L., the Supreme Court held that a 911 call articulating that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" did not provide reasonable articulable suspicion to support a Terry stop, because the call was "made from an unknown location by an unknown caller." Id. at 268, 270. The J.L. Court held that the 911 call in that case was not supported by sufficient "indicia of reliability" to support a Terry stop. Id. at 270-74. However, consistent with decades of caselaw governing Terry stops, the J.L. Court noted that a determination of reasonable articulable suspicion was a fact-based analysis and specifically noted that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" Id. at 270 (quoting Alabama v. White, 496 U.S. 325, 327 (1990). Thus, contrary to Defendant's suggestion, J.L. does not foreclose the possibility that the officers could have relied upon the 911 call and

16

subsequent lookout in this case.  Furthermore, as laid out more fully below, the 911 call in this case demonstrated the specific "indicia of reliability" that the Supreme Court and D.C. Circuit have found to be sufficient to warrant a Terry stop and frisk.

Defendant next cites United States v. Lawson, 1994 WL 9944, at *4 (D.C. Cir. 1994) for the proposition that "[i]n order to rely solely on a tip from an unknown informant for reasonable suspicion, the informant must predict future behavior or convey particularly detailed information, and the tip must be corroborated by police surveillance." Def. Motion, at 10. Defendant's reliance on Lawson is misplaced. First, Defendant overlooks that, the 911 call in this case was not an "anonymous tip" – the 911 caller whose lookout resulted in Defendant's arrest provided his name and home address.  Defendant also overlooks that Lawson specifically noted that "if an informant declares that a described individual is armed, courts have upheld *protective* investigatory stops despite the tip's lack of detail or prediction behavior." Id. (citing Adams v. Williams, 407 U.S. 143 (1972)).

The exceptions noted in Lawson are in accord with Supreme Court and D.C. Circuit caselaw on this issue.  In Navarette v. California, 572 U.S. 393, 399 (2014), the Supreme Court noted that a 911 caller's expression of "eyewitness knowledge" of the event lends "significant support to the tip's reliability." Indeed, the Court noted that the caller's use of the 911 emergency system was, itself, an "indicator of veracity" because 911 calls are recorded, false reports are subject to prosecution, and the caller's information is made available to 911 dispatchers. Id. at 400-01. The 911 call in this case was precisely the sort that can be relied upon according to Navarette. The caller gave "eyewitness knowledge" of what he was seeing in real-time, and provided his telephone number and address. Officers then traveled to that address to speak with the caller as

part of canvassing for the suspects. The caller reiterated the statements made over the 911 call, and provided his name – in addition to his telephone number and address.  As such, he made himself subject to prosecution for filing a false report, and the officers were justified in stopping and frisking Defendant, who matched the description he gave. Navarette, 572 U.S. at 400-01; Adams, 407 U.S. 146-48; White, 496 U.S. at 327;  Lawson, 1994 WL 9944, at *4.

### 2.    The Terry Stop was Justified Because Defendant Matched the Description Given in the 911 Call

Defendant next argues that, even if the Court finds that the 911 call and ensuing lookout had sufficient indica of reliability to justify a Terry stop, the officers were nevertheless unjustified in stopping Defendant because he did not perfectly match the description and he was carrying a small child when officers saw him. Def. Motion, at 10-11.[2]  This argument is also without merit.

The parties agree on all of the relevant facts: (1) the 911 caller noted that the armed suspect was a black male, approximately 17 years of age, wearing a white tank top, jeans, a loose, black durag, and carrying a black backpack, and that a second suspect was a black male, approximately six foot tall, wearing jeans and a white t-shirt with a "wild bush" hairstyle; (2) the MPD dispatcher repeatedly broadcast a lookout for a black male, approximately 17 years of age, wearing a white t-shirt, jeans, a loose, black durag, and a black backpack; (3) Defendant was stopped wearing a white t-shirt, jeans, a loose, black durag, and a black backpack; (4)  Defendant is not 17 years old.

---

[2] Defendant also argues that "[T]here is no proof that [he] picked up his child from a group of people after the tipster called in his description." Def. Motion, at 11. This argument ignores that the entirety of the radio communication was recorded.  Sergeant Orgel saw Defendant pick up the child, and notified other MPD Officers that a suspect matching the lookout description had just picked up a child. He could not have done so if he did not already know what the lookout description was.

Defendant does not cite to any caselaw which holds that officers may only stop individuals who perfectly match the lookout description, relying on a citation to the <u>Lawson</u> case described above. However, the D.C. Circuit has considered — and denied — Defendant's precise argument, because "[i]n demanding a perfect match to a lookout description, [the defendant] is asking us to fast-forward the criminal process to the jury trial phase. This we cannot do. <u>Terry</u>'s reasonable suspicion standard demands less of the government than the preponderance standard." <u>Abdus-Price</u>, 518 F.3d at 931. In <u>Abdus-Price</u>, a lookout was issued in relation to an armed robbery, describing two suspects last seen in a "Crown Vic Ford model, tan on the side, black on top with smoked-out windows, year between 94 and 97. Last seen Westbound on Florida and Northbound on Trinidad." <u>Abdus Price</u>, 518 F.3d at 928. Approximately 40 minutes after the robbery, MPD Sergeant Hance saw a "Ford Crown Victoria with dark tinted windows, dark blue in color with a white driver's side rear door" and effected a traffic stop based on the lookout. <u>Id</u>. at 211.

The Court upheld the District Court's denial of Abdus-Price's motion to suppress, holding that "reasonable suspicion can survive in the face of discrepancies" between the lookout and the person or vehicle stopped because "'investigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by victims or witnesses may be in error.'" <u>Id</u>. at 213-14 (quoting 4 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(g) at 557 (4th Ed. 2003); and citing <u>Davis</u>, 235 F.3d at 588; <u>United States v. Hurst</u>, 228 F.3d 751, 756-57 (6th Cir. 2000); <u>Bailey v. United States</u>, 389 F.2d 305, 309 (D.C. Cir. 1967)). The D.C. Circuit has also held that officers are justified in effecting a <u>Terry</u> stop on an individual whose race, clothing, and location are consistent with the 911 call and subsequent lookout. <u>Davis</u>, 235 F.3d at 587; <u>United States v. Smart</u>, 98 F.3d 1379, 1384 (D.C. Cir. 1986).

Here, Defendant was observed by Sergeant Orgel in a location consistent with where the armed suspect might be based on the location and direction of travel provided in the 911 call and lookout.



Defendant's clothing matched the dispatcher's broadcasted lookout <u>identically</u> – jeans, white t-shirt, loose-fitting black durag and black backpack, and Sergeant's Orgel's observations explained why Defendant was carrying a child. That Defendant appeared older than the lookout description is the type of "descriptive factor" discussed by Professor LaFave. LaFave, Search and Seizure, § 9.5(g) at 557.

The officers knew that a 911 call had been placed for a man with a gun, which included a specific description of the suspects' race, clothing, and direction of travel, and they observed an individual who closely matched that description in a location where the suspect might be. Under the totality of the circumstances, a reasonably prudent officer would believe that he was justified in doing exactly what the officers did here – stopping Defendant to perform a limited search for weapons. <u>Washington</u>, 449 F.3d at 576; <u>Abdus-Price</u>, 518 F.3d at 929-31; <u>Goddard</u>, 491 F.3d at

460; Edmonds, 240 F.3d at 59-60; Davis, 235 F.3d at 586-88; Smart, 98 F.3d at 1384; Clark, 24

F.3d at 301-03.[3]

### 3.    The Officers Were Not Required to Determine if Defendant Was Legally Able to Carry a Firearm Prior to Conducting a Frisk

Defendant next argues that the stop was unjustified under the Second Amendment because

MPD Officers did not determine whether Defendant had a concealed carry permit before

performing a pat down. Def. Motion, at 12-15. This argument is also meritless.

Defendant's argument relies on his citation to the dissenting opinion in United States v.

Robinson, 694 (4th Cir. 2017), cert. denied 583 U.S. 943 (2017). Def. Motion, at 12. Respectfully,

the United States submits that the Robinson majority correctly rejected the defendant's argument

because it incorrectly "presumes that the legal possession of a firearm cannot pose a danger to

police officers during a forced stop. . . [and] fails at several levels when considered under the

Supreme Court's 'stop and frisk' jurisprudence." Id. at 698. Consequently, Robinson does not

support Defendant's argument.

Defendant next cites to Northrup v. City of Toledo Police Department, 785 F.3d 1128 (6th

Cir. 2015). Def. Motion, at 14. Northrup involved a civil suit under 18 U.S.C. § 1983 based on a

police officer's act of "handcuffing and disarming" a man who was openly carrying a firearm as

permitted by Ohio law. Id. at 1129-31. Defendant fails to note that the Northrup Court specified

---

[3] Defendant discredits the officers' suspicion of him by analogizing to Illinois v. Wardlow, 528 U.S. 119, 125 (2000) and United States v. Holmes, 660 F.3d 1339, 1340-41, 45 (D.C. Cir. 2004). Def. Motion, at 10-11. This attempt falls flat, however, because Wardlow and Holmes merely provide examples of factual circumstances where the Court upheld a Terry stop. Given the fact-based analysis inherent in Fourth Amendment challenges, it is simply not the case that a Terry stop is only justified on facts identical to either Wardlow or Holmes. Indeed, the D.C. Circuit has upheld Terry stops on facts analogous to those in this case. Abdus-Price, 518 F.3d at 929-31; Davis, 235 F.3d at 586-88; Smart, 98 F.3d at 1384.

the applicability of it's holding to Ohio's specific gun laws: "Not only has the State made open carry of a firearm legal, but it also does not require gun owners to produce or even carry their licenses for inquiring officers." Id. at 1132 (citing OHIO REV. CODE §§ 9.68(c)(1), 2923.12). Moreover, in Ohio, "unlawful possession is not the default status." Id. (internal quotation and citation omitted).

The law governing the carrying and possession of firearms in Washington, D.C. is materially different from the Ohio laws analyzed in Northrup. For starters, carrying a firearm is presumptively unlawful in D.C., and those licensed to carry firearms are subject to regulations requiring inter alia, that the firearm be holstered and secure. See, e.g., 24 D.C.M.R. § 2344.2. Further, any firearm carried pursuant to a concealed carry license must be registered. D.C. Code §§ 7-2502.01; 22-4506. Furtherer, a licensee is required to carry both his concealed carry license and the registration certificate for the firearm at all times that he is carrying the firearm. Id. § 7-2509.04(c). Moreover, and most importantly to Defendant's argument, D.C. Code provides that:

> If a law enforcement officer initiates an investigative stop of a licensee carrying a concealed pistol pursuant to § 22-4506, the licensee, and any other licensee carrying a concealed pistol pursuant to § 22-4506 who is with the stopped licensee at the time of the investigative stop, shall:
>
> (1) Disclose to the officer that he or she is carrying a concealed pistol;
>
> (2) Present the license and registration certificate;
>
> (3) Identify the location of the concealed pistol; and
>
> (4) Comply with all lawful orders and directions from the officer, including allowing a pat down of his or her person and permitting the law enforcement officer to take possession of the pistol for so long as is necessary for the safety of the officer or the public.

Id. § 7-2509.04(d) (emphasis added).

Here, both the lookout and Defendant's conduct when Officer Alsoloman approached him, justified the stop and frisk <u>even</u> <u>if</u> Defendant had a concealed carry license. First, the 911 caller, as relayed by the MPD Dispatcher, clearly stated that the suspect had removed the handgun from a backpack and placed it into the waistband of his jeans – in other words the gun was not holstered as required by D.C. law. Further, Defendant failed to comply with Officer Alsoloman's lawful orders and directions, and did not submit to a pat down – rather he tried to push past Officer Alsoloman while "blading" the gun-side of his waist away from the officer. Thus, the Officers had no reason to consider the possible lawfulness of Defendant's actions because his actions were not consistent with the requirements for lawful gun possession in the District of Columbia.

Given the divergence between Ohio law and the D.C. Code, Judges in this District have declined to follow <u>Northrup's</u> reasoning. <u>See</u>, <u>e.g.</u>, <u>Minute Order</u>, <u>United States v. Gentry</u>, Case No. 22-CR-167 (TJK) (Oct. 20, 2023); <u>Order</u>, <u>United States v. Irving</u>, Case No. 22-CR-267 (RC) (D.D.C. Mar. 1, 2023) (Docket Entry 33 at 7–8) (footnote omitted) (<u>Attachment</u> <u>One</u>); <u>Transcript of Evidentiary Ruling</u>, <u>United States v. Hedrick</u>, 22-CR-345 (RC) (D.D.C. Feb. 24, 2023) at 13:24–14:11 ("Mr. Hedrick argues that because carrying a concealed firearm is lawful in D.C., simply seeing a concealed firearm on an individual is insufficient to generate a reasonable suspicion of criminal activity. I'm unpersuaded. Although D.C. allows concealed carry, it has detailed licensing requirements, and it requires one to carry any pistol in a holster on their person and in a firmly secured manner.") (<u>Attachment</u> <u>Two</u>).

### 4. *Officer Alsoloman Did Not Exceed the Scope of a <u>Terry</u> Stop*

Without citation to legal authority, Defendant contends that the officers exceed the scope of a <u>Terry</u> stop by placing "their hands under the outer surface of garments." <u>Def. Motion</u>, at 15.

This argument is unsupported by the evidence.

When Officer Alsoloman approached Defendant, he was aware of a "lookout" for an individual matching Defendant's description carrying a handgun on the right side of his waist. When Defendant attempted to push past Officer Alsoloman, and Officer Alsoloman attempted to detain him for a <u>Terry</u> pat down, Officer Alsoloman observed a bulge that he recognized to be a firearm in Defendant's right waistband.  Officer Alsoloman's BWC shows that he patted the area where he saw the bulge (the same place where the 911 caller said a firearm would be), and confirmed with his touch what he saw with his eyes, and then retrieved the firearm.  Nothing about this process exceeds the acceptable bounds of a <u>Terry</u> stop.



### 5.    *Officers Did Not "Effectively Arrest" Defendant*

Defendant argues in the alternative that, even if the Court finds reasonable suspicion for a <u>Terry</u> stop, the evidence must be suppressed because Defendant was "effectively arrested" when the Officers "surrounded him, restrained him, handcuffed him, and snatched his baby from his

arms, all before so much as questioning him." Def. Motion, at 16. This argument also assumes facts other than what the evidence will actually show.

Defendant's description of the encounter is just wrong. Defendant claims he "was surrounded, placed in handcuffs, and effectively arrested without a warrant." Id. The BWC does not support this claim. Rather, it shows Officer Alsoloman approach Defendant, and calmly state "What's going on, man, we need to speak to you, can you put the child down?" Defendant contends that officers "immediately placed hands on him, making him think that he was being arrested[,]" (Def. Motion, at 18) but, as the BWC shows, Officer Alsoloman did not touch Defendant until Defendant attempted to push past him. Only then did Officer Alsoloman grab Defendant's wrist and attempt to place him in handcuffs. At this same time, Officer Villatoro took Defendant's child in her arms for the child's safety, and Officer Fernandez assisted Officer Alsoloman in detaining Defendant – who was still resisting Officer Alsoloman.

Finally, Defendant contends that "when he was placed in handcuffs, there was no doubt in Mr. Minor's mind that he was under arrest." Def. Motion, at 18.[4] However, it is well-settled that police officers may utilize handcuffs in effecting a Terry stop of someone they believe is armed

---

[4] Notably, Defendant cites United States v. Clipper, 973 F.2d 944, 951 (D.C. Cir. 1992) as support for this point. This citation is curious given that Clipper, which was deemed by the D.C. Circuit to have been abrogated by the Supreme Court's J.L. decision, held that a Terry stop was not converted to an arrest merely because one officer drew their service weapon – listing the fact that handcuffs weren't used as one of several factors that the Court considered. Id., abrogated as recognized by United States v. Clipper, 313 F.3d 605, 607 (D.C. Cir. 2002). Notably, however, the reasoning applied in Clipper supports the actions off Officers Alsoloman, Villatoro, and Fernandez in stopping and frisking Defendant. "Th[e] element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in 'controlled buys.' Where guns are involved, however, there is a risk that an attempt to 'wait out' the suspect might have fatal consequences." Clipper, 973 F.2d at 951 (emphasis added).

and dangerous. <u>See</u> <u>United States v. Dykes</u>, 406 F.3d 717, 720-21 (D.C. Cir. 2005).  In <u>Dykes</u>, the

D.C. Circuit upheld the use of handcuffs during a <u>Terry</u> stop because:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

<u>Id</u>. (quoting <u>Terry</u>, 392 U.S. at 24).

Here, MPD Officers had a lookout that a man matching Defendant's description was in the area with a gun in his waistband.  Sergeant Orgel observed Defendant pick up the child and walk to the location where Officer Alsoloman attempted to question him.  Defendant then not only refused to answer questions but attempted to push past Officer Alsoloman while carrying a baby on the right side of his waistband – the exact location where Officers believed a firearm was located (and from whence a firearm was ultimately recovered).  At the moment Officer Alsoloman, grabbed Defendant's wrist and attempted to place Defendant in handcuffs, he believed Defendant was armed and presently dangerous to others – including both the officers and the child he was carrying directly over a firearm. Placing Defendant in handcuffs to stop him from resisting further was justified under the circumstances and did not transform the <u>Terry</u> stop into an arrest. <u>Terry</u>, 392 U.S. at 24;  <u>Dykes</u>, 406 F.3d at 720-21.

The cases relied upon by Defendant do not support his claim.  Defendant first cites <u>Hall v. District of Columbia</u>, 867 F.3d 138, 153 (D.C. Cir. 2017). <u>Def. Motion</u>, at 17. In <u>Hall</u>, a woman was forcibly handcuffed and placed in the back of a police cruiser for 45 minutes after restaurant employees, not knowing that she had left her credit card, saw her leaving the restaurant to a neighboring bar, believed she was walking out on her bill, and called the police.  <u>Hall</u>, 867 F.3d at

153. Respectfully, the only fact that <u>Hall</u> appears to have in common with this case that they both originated with a call to MPD. As such, the <u>Hall</u> Court's fact-based Fourth Amendment analysis is not particularly instructive to this Court in this case.

Defendant also relies on <u>United States v. Laing</u>, 889 F.3d 281, 285-86 (D.C. Cir. 1989). <u>Def. Motion</u>, at 18-19.  In <u>Laing</u>, the D.C. Court considered the <u>Terry</u> stop of a defendant who, upon seeing officers moving toward an apartment building, "appeared startled, shoved his hand into the front of his pants[,]" and ran toward the apartment that officers had a warrant to search. <u>Laing</u>, 889 F.3d at 283.  When the defendant refused lawful orders to stop, the officers tackled him and, when defendant refused lawful orders to remove his hands from his pants, the officers removed them by force. <u>Id</u>. at 283-84.  Notably, in analyzing Laing's motion to suppress, the D.C. Circuit reiterated that an officer's decision to use handcuffs, forcibly detain a person, or draw their service weapon do not, *per se*, transform a <u>Terry</u> stop into an arrest. <u>Id</u>. at 285 (citations omitted).

Nevertheless, Defendant relies on <u>Laing's</u> articulation of factors that may justify an escalated use of force, including: "the time of day, the 'high-crime' nature of the area, <u>an informant's tips that persons might be armed</u>,[5] furtive hand movements, flight or attempted flight by the person sought to be detained, and a pressing need for immediate action." <u>Laing</u>, 889 F.2d 285-86 (citing <u>Adams</u>, 407 U.S. at 147-48); <u>United States v. White</u>, 648 F.2d 29, 39 (D.C. Cir. 1981) (emphasis added)).  Here, the Officers had a credible tip that someone matching Defendant's description had a gun on the right side of his waistband and when Officer Alsoloman attempted to question Defendant, Defendant bladed the right side of his body away from Officer Alsoloman

---

[5] Curiously, Defendant's parenthetical detailing the factors outlined in <u>Laing</u> includes all of those factors except the one most relevant to this Court's consideration. <u>Def. Motion</u>, at 18-19.

and attempted to push past him. Under those facts, Officer Alsoloman was perfectly justified in restraining Defendant for the purposes of effecting a <u>Terry</u> stop. As the D.C. Circuit has long recognized, "[a]s a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking." <u>Bailey</u>, 389 F.2d at 315-16, <u>cited in United States v. White</u>, 648 F.2d 29, 39 (D.C. Cir. 1981).

### 6.    *The Officers Did Not Violate Defendant's <u>Miranda</u> Rights*

Defendant concludes his Motion to Suppress Evidence with a two-paragraph conclusory argument that the Officers violated his <u>Miranda</u> rights. <u>Def. Motion</u>, at 18. Defendant cites to no case other than <u>Miranda</u> itself, and makes no attempt to articulate that Defendant was subject to "interrogation" as that term has been defined by the Supreme Court following <u>Miranda</u>. <u>See</u>, <u>e.g.</u>, <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299-302 (1980). Given that Defendant was not subject to interrogation, the United States submits that Defendant's motion must fail – regardless of whether the statements were made while Defendant was in custody. Should Defendant file a more fulsome motion to suppress statements, the United States reserves the right to respond in kind.

### <u>CONCLUSION</u>

Metropolitan Police Department Officers approached Defendant in an attempt to question him based on a 911 call stating that someone fitting his description was carrying a firearm in their waistband. Defendant refused to stop and, indeed, attempted to push past Officer Alsoloman. When Officer Alsoloman attempted to restrain Defendant he saw a bulge on the right side of Defendant's waistband, patted that area, felt a handgun, and removed it from Defendant's waistband before he and Officer Fernandez placed Defendant in handcuffs and under arrest. The

28

officers' actions were justified by reasonable suspicion that Defendant was armed and dangerous and their restraint of Defendant was reasonable under the circumstances.

WHEREFORE, the United States respectfully submits that Defendant's "Motion to Suppress Evidence" (Docket Entry 17) should be DENIED.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ James B. Nelson
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Court's CM/ECF system on November 15, 2023.


By:    */s/ James B. Nelson*
       JAMES B. NELSON
       Assistant United States Attorney